**IN THE UNITED STATES DISTRICT COURT for the**
**DISTRICT OF KANSAS**
**KANSAS CITY, KANSAS**

BRIAN KIRK

       Plaintiff,

   vs.

NORTON COUNTY HOSPITAL
SERVE: Norton County Clerk, Robert Wyatt
      105 S. Kansas Avenue, 2nd Floor
      Norton, Kansas 67654

     Defendant.

Case No.: _____

## COMPLAINT AND JURY DEMAND

The Plaintiff, BRIAN KIRK ("Mr. Kirk" or "Plaintiff") by and through undersigned record, brings this action against NORTON COUNTY HOSPITAL ("NCH") under the Federal False Claims Act, 31 U.S.C. § 3730(h), seeking redress for Defendant NCH's wrongful and unlawful retaliation for Mr. Kirk's complaints made about illegal conduct, and his efforts to stop one or more violations of the FCA by Defendant. Plaintiff alleges that Defendant NCH, by and through its agents, has violated the whistleblower's protection section of the FCA, 31 U.S.C. § 3730(h), by unlawfully retaliating against the Plaintiff for his attempts to report, to correct, and/or to stop the illegal conduct described herein.

## INTRODUCTION

1.      This case seeks to recover damages and civil penalties arising from NCH's unlawful employment practices against Mr. Kirk, including subjecting him to a series of illegal retaliatory actions leading up to and including termination from his position as CEO of NCH.

2.      NCH violated the anti-retaliation provisions of the federal FCA by retaliating against Mr. Kirk and unlawfully terminating him for engaging in statutorily protected activities between October 2021 and May 2023, including:

   (a) Internal reporting of NCH potentially violating the Physician Self-Referral Statute (commonly referred to as the Stark Law), 42 U.S.C. § 1395nn;

   (b) Advising NCH to follow the federal law and the applicable rules and regulations governing Medicare patient referrals and compensation arrangements for physicians employed by the hospital; and

   (c) Objecting to NCH's violations of the Stark Law.

3.      As a result of Mr. Kirk's actions, he faced a series of ongoing adverse actions detailed in this Complaint. At all times, NCH had notice of Mr. Kirk's protected activities and retaliated against him, ultimately, terminating him from the hospital on May 17, 2023.

4.      After termination, NCH continued to retaliate against Mr. Kirk by publically broadcasting his termination on Becker's Hospital Review, a medical industry trade magazine, and continued to tarnish his reputation.

5.      Mr. Kirk's internal reports and efforts to detect and correct NCH's failure to comply with the federal law and the rules and regulations and/or failure to follow company policies are reasonably tied to NCH's unlawful conduct regarding employment agreements with physicians, which involved compensation paid above fair market value. In so doing, NCH violated the Stark Law and implicated the FCA. Thus, Mr. Kirk is protected under the anti-retaliation provisions of the federal FCA.

6.      As a result of the retaliatory actions taken against Mr. Kirk, he suffered, and continues to suffer, damages.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omission giving rise to this action, including the unlawful retaliatory employment practices alleged herein, occurred in the District of Kansas.

9.      This action is also brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. 31 U.S.C. § 3732 specifically confers jurisdiction in this Court for actions brought pursuant to 31 U.S.C. §§

3729 and 3730. This case arises from Defendant's retaliatory conduct against and wrongful discharge of the Plaintiff upon engaging in statutorily protected activity.

10.     This Court has personal jurisdiction over the Defendant under 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because the Defendant has at least minimum contacts with the United States and the District of Kansas.

11.     31 U.S.C. § 3732(a) provides "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in any proscribed by section 3729 occurred." Here, venue is proper in the State of Kansas because Defendant's principal place of business is in Kansas.

**PARTIES**

12.     Plaintiff Brian Kirk is a citizen of the United States of America and a resident of Norton County, Kansas. Plaintiff was appointed as Chief Executive Officer ("CEO") of Defendant NORTON COUNTY HOSPITAL in September of 2021 and officially started working as CEO on October 18, 2021. From October 18, 2021 to May 17, 2023, he was employed by Defendant NORTON COUNTY HOSPITAL as Chief Executive Officer ("CEO"). He brings this action based upon direct and personal information obtained during the period of his employment as CEO by NORTON COUNTY HOSPITAL.

13.     Mr. Kirk is a Fellow of the American College of Healthcare Executives (FACHE), a Fellow of the Healthcare Financial Management Association (FHFMA), and a Certified Medical Practice Executive (CMPE) by the Medical Group Management Association (MGMA). He is a certified public accountant, specializing in healthcare and has a bachelor's degree from Texas

A&M University and a master's degree in Business Administration from Regis University in Denver, Colorado.

14.     Defendant NORTON COUNTY HOSPITAL is a Critical Access Hospital in the State of Kansas. Defendant acts in the role of providing a full range of medical services to patients in its service area, including Norton County, Kansas and surrounding northwest Kansas and southwest Nebraska communities. NCH includes inpatient care, outpatient ancillary services, and various visiting physician specialty clinics. At all times relevant to this action, NCH employed Mr. Kirk as its CEO. NCH retaliated against Mr. Kirk in the manner described in this Complaint at the Kansas location.

## LEGAL BACKGROUND

15.     The anti-retaliation provision of the Federal FCA, 31 U.S.C. § 3730(h), makes it unlawful to discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under that section or other efforts to stop one or more violations of the FCA.

16.     Statutory relief under this provision entitles the employee to all relief necessary to make the employee whole and expressly includes reinstatements with the same seniority status, benefits and salary which that employee would have had but for the discrimination, or front paying the alternative; two times the amount of back pay, interest on the back pay, litigation costs and reasonable attorneys' fees, and compensation for any special damages sustained as a result of the discrimination, which has been held to include emotional distress.

## FACTS COMMON TO ALL COUNTS

### I.     Unlawful Retaliation Under the Federal and State False Claims Act.

**A. Plaintiff Engaged in Protected Activity by Raising Concerns about NCH's Potential Stark Law Violations.**

17.     In September of 2021, Mr. Kirk was appointed CEO of NCH. He officially assumed responsibility as the CEO on October 18, 2021.

18.     At the point of Mr. Kirk's hire, NCH was in a dire financial situation. Immediately upon starting his position as CEO, Mr. Kirk dedicated himself to facilitating cost reduction efforts at NCH. For example, Mr. Kirk made changes to nurse staffing ratios, eliminated non-essential positions, as well as lucrative traveling nurse contracts from the facility. This resulted in nearly $1 million in cost reductions for NCH.

19.     As another example of Mr. Kirk's efforts to reduce costs for NCH, Mr. Kirk also converted the 340B Drug Pricing Program from losing $40,000 per month to making a monthly profit of $30,000 by the end of June 30, 2022.

20.     These are just a few examples. Under Mr. Kirk's leadership and directives, the hospital experienced substantial improvements to its precarious financial situation, primarily between October 2021 and April 2022.

21.     Accordingly, Mr. Kirk was held in high esteem by the NCH Board of Trustees ("Board") and the NCH executive leadership and management, including Rich Miller, former Administrator/CEO; ReChelle Horinek, Senior Leadership Chief Financial Officer; Shannon Hempler, Human Resources Manager; Gary Bydler, Norton County Commissioner and Hospital Liaison; and Von Farenbrook, former Board President.

22.     The Board governs the staff of NCH, including its active medical staff, administrators, departmental supervisors, and other employees. The Board is appointed by the Norton County Commissioners and consists of seven members.

23.     Additionally, Mr. Kirk received positive performance reviews within the first eight months of serving as CEO of NCH. For example, in his first performance evaluation dated June 6, 2022, he scored an average of 4.4 out of 5.[1] Notably, one Board member gave Mr. Kirk a 5 out of 5 for every question on the evaluation. Another Board member gave Mr. Kirk a 5 out of 5 for nearly all of the questions prompted by the evaluation. It was clear that Mr. Kirk was a valuable member of NCH and the NCH community.

24.     However, when Mr. Kirk made complaints about NCH's failure to comply with applicable law and regulations, circumstances changed.

25.     NCH is a Critical Access Hospital (CAH). CAH is a designation given to eligible rural hospitals by the Centers for Medicare & Medicaid Services. Congress created the CAH designation through the Balanced Budget Act of 1997 in response to over 400 rural hospital closures during the 1980s and early 1990s. The CAH designation is designed to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communications.

26.     To accomplish this goal, CAHs receive certain benefits, such as cost-based reimbursement for Medicare services. Relatedly, CAHs typically require medical staffing solutions for three primary areas—the medical clinic, hospital inpatients, and the emergency room.

27.     The standard for staffing CAHs typically consists of a professional health care staff that includes one or more doctors of medicine, and may include one or more physician assistants, nurse practitioners, or clinical nurse specialists. *See* 42 C.F.R. § 485.631.

---

[1] NCH's performance evaluation metric is as follows: 1 – Poor Performance, needs significant improvement and provided warning for failed performance; 2 - Substandard performance, needs improvement and requires an action plan to meet standard; 3 - Meets performance standard expectation; 4 – Meets all performance expectations and sometimes exceeds performance standards; and 5 - Consistently exceeds performance expectations. Board Members are asked to answer a total of 16 questions per performance evaluation.

28.    First, for NCH's medical clinic, by the end of June 30, 2022, NCH reported 10,381 medical clinic patients. Mr. Kirk opines that these patients could have been adequately treated by at most two doctors and one mid-level practitioner.

29.    However, by March 31, 2023, NCH had five doctors and two mid-level practitioners seeing patients at the medical clinic.

30.    Second, with regards to hospital inpatients, by the end of June 20, 2022, NCH reported on average, one acute patient and two skilled nursing patients per day. Mr. Kirk opines that the volume of the hospital inpatients can be adequately covered by one physician allocating one hour per day.

31.    Third, NCH's emergency room had two full-time medical staff covering five days plus per week. This equated to just two days per week in the emergency room for the five physicians and the two mid-level practitioners. In comparison, other critical access hospitals in Norton County operated with half or less as many medical staff providers. For example, Graham County Hospital has two physicians and two mid-level practitioners. Decatur County has one physician and two mid-level practitioners, and Sheridan County has two physicians and two mid-level practitioners.

32.    It became more apparent to Mr. Kirk that NCH was extremely overstaffed for a CAH operation.

33.    In April 2022, Mr. Kirk started to identify serious problems. There were at least three physicians that NCH was paying above fair market value ("FMV") despite the low number of patients they saw. The three doctors were subject to three-year income guarantees. This was neither reflective of the work each physician performed, nor was it a financially responsible business model.

*i.  NCH Paid Its Physicians Above Fair Market Value*

34.     As mentioned above in this Complaint, upon Mr. Kirk's hire, NCH had tasked him with significant responsibilities to curtail financial spend, including stopping the hemorrhaging of the NCH cashflows. For the past decade, the NCH deficits grew exponentially. On June 6, 2022, former Board President Jill Edgett wrote in Mr. Kirk's performance evaluation that "the goals [for Mr. Kirk] going forward [were] 1. to be [at NCH] long term and 2. to bring the hospital's budget back in the black." **Exhibit 1, Mr. Kirk's June 6, 2022, Performance Evaluation**.

35.     Despite NCH's financial losses and their purported goals to address the issues, Mr. Kirk learned that NCH paid above FMV salaries to at least three physicians. Mr. Kirk identified that NCH paid $513,000 for the first year of employment to Dr. Joshua Gaede and $415,000/year thereafter, $415,000/year to Dr. Miranda McKellar, and $415,000/year to Dr. Theresia Neill. **Exhibit 2, Dr. Joshua Gaede's August 16, 2019 Physician Employment Agreement.**

36.     At all times prior to this action, NCH Board was privy to the hospital's decisions for employment agreements. Dr. Gaede's agreement, executed on August 16, 2019, was signed on behalf of NCH Board of Trustees.

37.     Mr. Kirk was concerned that the overpayments to physicians contributed to the losses exhibited by the hospital. He was also concerned that the three physicians did not fulfill their obligation to meet the work relative value units ("wRVUs") set by the terms of their employment agreements.[2]

38.     Pursuant to the physician employment agreements, all three doctors, Dr. Gaede, Dr. McKellar, and Dr. Neill were expected to "[p]rovide scheduled Family Practice/OB with C-section patient care services at least four (4) days per week with a minimum of thirty-six (36) patient

---

[2] A wRVU is a standard unit of measurement used to establish value for common health care procedures.

contact hours per week in the clinic". This is in addition to emergency room and hospital inpatient roundings. **Ex. 2.**

39.     There were several concerns with these physician agreements.

40.     First, Mr. Kirk identified that these doctors were not working full-time but NCH paid them for full-time work. Mr. Kirk observed that each doctor only saw approximately 8-10 patients per day, which was below the average of other physicians seeing patients at NCH.

41.     In fact, time studies submitted with the annual audit cost report conducted by FORVIS demonstrated that each physician worked less than 1,000 hours per year combined. **Exhibit 3, Physician Time Studies**.

42.     Mr. Kirk knew of anecdotal instances where the physicians did not see patients in the clinic but indicated as such. Mr. Kirk also knew that these physicians frequently cancelled their clinic workdays whenever possible. For example, if there was overnight labor and delivery, the physicians would quickly cancel their clinic work schedule the next day. This created significant inconvenience to patients and to the hospital's intake process.

43.     Drs. Gaede, Neill and McKellar were the highest paid rural doctors according to a 2022 Kansas Hospital Association (KHA) physician compensation salary survey.

44.     In contrast, NCH paid physicians like Drs. Dakota Dreher (hired in 2022) a base salary of $285,000 and Dr. Jeff McKinnley (hired in 2023) a base salary of $300,000—FMV rates. Both physicians worked full-time hours, working over 1,000 hours per year.

45.     Second, Mr. Kirk was concerned that NCH was in violation of applicable rules and regulations governing physician compensation rates. NCH provides services to Medicare beneficiaries, and therefore, it must operate and furnish its services in compliance with applicable

laws, such as the Physician Self-Referral Statute (commonly referred to as the Stark Law), 42 U.S.C. § 1395nn.

46.    Mr. Kirk knew that the Stark Law prohibits a physician from referring Medicare patients for designated health services to an entity […] which the physician has a financial relationship. Financial relationships include both ownership and investment interest, or compensation arrangements. Although certain compensation arrangements, including *bona fide* employment relationships, constitute an exception, the relationship must adhere to strict conditions. Any amount paid by an employer to a physician who has a *bona fide* employment relationship with the employer for the provision of services if the following conditions are met:

> (A) The employment is for identifiable services.
> (B) The amount of the remuneration (value) under the employment is –
>      (i) Consistent with the fair market value of the services
> (C) The remuneration is provided pursuant to an agreement which would be
> commercially reasonable even if no referrals were made to the employer; and
> (D) The employment meets such other requirements as the Secretary may impose
> by regulation as needed to protect against program or patient abuse.

47.    Mr. Kirk concluded that the above FMV compensation rates offered to the three doctors were not determined based on the services performed, given that they worked significantly less hours and saw less patients than other physicians at NCH and in comparison, with state and national averages.

48.    To further investigate, in April and May of 2022, Mr. Kirk hired two independent consulting firms, which evaluated the compensation arrangements and concluded that they were above FMV.

49.    Mr. Kirk had brought in the two consultants to help the NCH Board understand the gravity of the situation. Mr. Bill Bellenfant, a consultant from Texas with 35 years of health care experience, stated in his written report to the NCH Board of trustees: "Physician visits are

averaging approximately 10-15 per clinical day…compared to a national average of 18-20 patient encounters daily for [family practice] physicians. In addition, the fixed salary levels at $415,000 annually compare to national averages of $250,000 for FP physicians… many Hospitals set a base salary with quarterly bonuses based on Relative Value Units (RVUs). The current levels of physician Compensation for [family practice physicians], the current level of productivity is not sustainable." **Exhibit 4, Bill Bellenfant consulting report**.

50.     Mr. Kirk also employed a second consultant, Tracy Bird of Medical Practice Advisors. Ms. Bird reported that in 2022, the two mid-level practitioners saw more patients in the medical clinic than the three physicians. The two mid-level practitioners recorded 5,810 clinic visits while the three doctors recorded a total of 5,681 clinic visits.

51.     Among other things, Ms. Bird provided a comparison analysis of wRVUs between the three physicians and the national average. The findings demonstrated that "the three physicians are less than the median wRVU's [reported by the MGMA]." Ms. Bird also added that "the physicians [were] compensated $125,213 higher than the MGMA median." **Exhibit 5, Medical Practice Advisor's (Tracy Bird) Report**.

52.     Mr. Kirk immediately raised the issue with the Board and proposed that NCH review and revise the employment agreements for Drs. Neill, McKellar, and Gaede.

53.     Upon Mr. Kirk's recommendation and request, in June 2022, the Board seemingly agreed to revise the compensation arrangements. The Board instructed NCH legal counsel, Frankie Forbes, of the Forbes Law Group to draft new agreements. Consequently, in July 2022, the Board reviewed new agreements for the three doctors.

54.     The three doctors negatively reacted to the revised agreements and became extremely hostile towards Mr. Kirk. The doctors refused to accept the new agreements. They also

urged NCH to terminate Mr. Kirk and find a new CEO to replace him. Mr. Kirk also faced strong pushback from some of the Board members, including Ms. Edgett, and Vice President Ron Fischer.

55.     During a July 2022 Board meeting, Ms. Edgett informed Mr. Kirk that she had communicated individually with the rest of the Board members, which included Secretary Jenny Braun, Treasurer Randa Vollersten, James Moreau, and Corey Roy, and that the Board had made an executive decision not to revise the existing compensation arrangements for Drs. Neill, McKellar, and Gaede.

56.     Mr. Kirk later learned that Ms. Edgett had separately conducted private meetings with Drs. Neill, McKellar, and Gaede to reassure them that their original employment agreement, which included above FMV compensation rates, including the three-year income guarantee that would be honored.

57.     It gets worse. The physicians initiated a retaliatory social media campaign against Mr. Kirk. The doctors publicly made false accusations, alleging that Mr. Kirk planned to remove them from the community, which would cause NCH to shut down the OB-GYN program.

58.     The doctors verbally attacked Mr. Kirk, calling him a narcissist and claiming that he was a terrible administrator who would destroy NCH.

59.     Despite the Board's failure to revise the employment agreements, and the physicians' retaliation against Mr. Kirk, he continued to express concerns to the Board. Mr. Kirk raised the misrepresentations made in the annual Medicare Cost Report submitted to CMS. For example, in 2022, NCH reported in the Medicare Cost Report that they compensated three of their physicians at $1,338,150. Specifically, worksheet M-2 indicates that the three physicians worked

only an equivalent of 1.09 FTE's[3], when the employment agreements defined them as full-time physicians. **Exhibit 6, Medicare Cost Report**.

60.     Mr. Kirk's investigative efforts concluded that by entering into employment agreements with physicians which involved compensation being paid above FMV, NCH was in potential violation of the Stark Law, thereby implicating the FCA.

61.     To be clear, the above FMV compensation rates offered to the three doctors were not determined based on the services performed. Further, NCH did not do anything to address Mr. Kirk's concerns and efforts to stop the fraud.

### B. NCH Had Knowledge of Mr. Kirk's Protected Conduct.

62.     As mentioned above, in at least three written instances, Mr. Kirk provided direct notice to the Board of his knowledge and concerns about NCH's Stark Law violations. In addition to these formal written grievances, Mr. Kirk offered the NCH Board solutions to both the Stark Fraud and Abuse issues and the business case of these three physicians producing far less than they were consuming.

63.     On October 5, 2022, Mr. Kirk submitted an employee grievance report to the Board. Mr. Kirk underlined his continued concerns about NCH's Stark Law violations. Specifically, Mr. Kirk denoted that NCH paid at least three doctors above FMV. To support his conclusion, Mr. Kirk provided data that revealed that two mid-level practitioners saw more patients than Drs. Neill, McKellar, and Gaede combined. **Exhibit 7, Mr. Kirk's October 5, 2022, Written Grievance**.

64.     Despite NCH's own policy to respond to grievance reports within 30 days, Mr. Kirk did not receive any response to his grievance report until January 2023.

---

[3] Full Time Employees.

65.     Given the Board's non-response and a noticeable escalation in the hostile work environment that Mr. Kirk had to suffer, on December 15, 2022, Mr. Kirk submitted a second letter to the Board requesting their support to ensure that compensation levels and other revenues paid to employed physicians complied with the applicable rules and regulations.

66.     In the letter to the Board, Mr. Kirk expressly listed his concerns. **Exhibit 8, Mr. Kirk's December 14, 2022, Letter to Board**.

67.     First, Mr. Kirk stated the "[p]ossible Stark Fraud and Abuse concerns that [the hospital] substantially overpa[id] doctors for the amount of work they are actually doing." **Ex. 8.**

68.     Second, Mr. Kirk also asserted that "[he had] brought these Stark violation[s] to the Board's attention in a written Grievance dated October 5th and to date [he had] not received any response." **Ex. 8.** This was in direct violation of NCH's own policies and procedures.

69.     Finally, Mr. Kirk explained that "[t]he only way to keep all three doctors in practice at Norton Medical Clinic [was] to renegotiate their employment agreements to financially align them with the hospital and clinic and to keep them in fair market value with [Medical Group Management Association] guidelines." **Ex. 8.**

70.     Mr. Kirk repeatedly offered suggestions and recommendations that could keep NCH in compliance with all federal and state healthcare rules and regulations. For example, at the request of Mr. Kirk, NCH brought in a valuation firm, the Coker Group.

71.     Coker Group reported that FMV compensation should be between $280,000 - $300,000 for a full-time physician working at NCH. The firm confirmed that the three physicians were paid above FMV.

72.     However, NCH refused to rectify the physician compensation agreements for select physicians.

73.     In the December 2022 letter to the Board, Mr. Kirk also expressed concerns about NCH's potential violations of the Kansas Open Meetings Act ("KOMA"). *See* KSA 75-4317, *et seq.*  For example, on November 16, 2022, Ms. Edgett had instructed Mr. Kirk to inform Dr. Neill to refrain from creating a schedule that caused extra payments to NCH's advanced practice providers. Pursuant to KOMA, Board members are required to convey such directives during an open session. Ms. Edgett's unlawful conduct not only violated KOMA, but also sabotaged Mr. Kirk's CEO position as instructing him to take such action in secret would set him up for failure. Nearly three months after Mr. Kirk's grievance report filed on October 5, 2022, on January 4, 2024, Mr. Kirk finally received a written response by NCH legal counsel, Frankie Forbes.

74.     During the time that Mr. Kirk did not receive a response, he continued to be retaliated against. During monthly meetings held between November and December 2022, at one point, Ms. Edgett whispered to him that "[the] Board [was] going in a new direction" and sneered at him.

75.     Mr. Kirk was threatened. He was concerned that he would lose his job.

### C.   NCH Retaliated Against Mr. Kirk For His Protected Activity

76.     Alarmed that NCH's Stark Law violations would create liability under the FCA, Mr. Kirk had alerted NCH leadership, including the NCH Board of NCH's concerning practices of overcompensating physicians, raising possible Stark Law violations, and making strong recommendations to correct the conduct.

77.     After Mr. Kirk's repeated protected activity, finally, on January 4, 2023, Frankie Forbes, counsel for the Board, responded to Mr. Kirk's grievance letters dated October 5, 2022, and December 15, 2022.

78.    In the January 4, 2023, letter, Mr. Forbes admitted that the Board was aware that "the current compensation packages for Drs. Gaede, Neill and McKellar [were] quite aggressive," but that "raising this issue on December 15" … "[was] counterproductive" even though Mr. Kirk had raised the issue in early 2022 on several different occasions with the Board.

79.    Instead of rectifying the issues that Mr. Kirk had raised on numerous occasions over the course of 2022, NCH subjected Mr. Kirk to retaliation. Among other things, Mr. Kirk also became subject to a hostile work environment instigated by Ms. Edgett. For example, on or about October 20, 2022, Ms. Edgett instructed Mr. Kirk to enroll in the Acumen Understanding Disruption program, falsely accusing Mr. Kirk of engaging in disruptive behavior in the workplace.

80.    To be clear, this was *after* Mr. Kirk had raised concerns about potential government health care fraud. The alleged disruption was Mr. Kirk's written grievance to the Board dated October 5, 2022, raising concerns about Stark Fraud and Abuse.

81.    In October 2022, the NCH Board called a special meeting with Mr. Kirk. He assumed that the Board would discuss his grievance report and figure out a way to ensure that NCH complied with potential Stark Law violations.

82.    Instead, it turned out to be a series of personal attacks from the Board against Mr. Kirk.

83.    Ms. Edgett asserted that Mr. Kirk was a poor leader and that the employees and the community did not like him. She further stated that Mr. Kirk needed leadership training.

84.    Ron Fisher also criticized Mr. Kirk's decision to fill a finance position with Aaron Keuhn to assist with closing books back in June 2022. Mr. Kirk had previously obtained NCH Board approval before hiring Mr. Kuehn.

85.    Ms. Vollerton also attacked Mr. Kirk with baseless arguments regarding his religious activities. The Board knew that Mr. Kirk was a Deacon. Ms. Vollerton alleged that Mr. Kirk discriminated against patients, alleging that Mr. Kirk had only given the Holy Communion to Catholics.

86.    This meeting became the start of a hostile work environment for Mr. Kirk. Each member of the Board had negative things to say about Mr. Kirk. They retracted on select decisions that they had previously approved. NCH utilized the Board meeting as an inappropriate platform to humiliate and embarrass Mr. Kirk.

87.    Following the meeting, Ms. Edgett also began scrutinizing Mr. Kirk's work and questioning his leadership. In another example, on March 8, 2023, Ms. Edgett singled out Mr. Kirk by giving him an early deadline to submit annual performance reviews and telling him to re-do his review for no reason whatsoever. Indeed, Mr. Kirk was the only NCH personnel that was asked to expedite the submission of his evaluation.

88.    Ms. Edgett also isolated Mr. Kirk and disinvited him to meetings. In April 2023, Mr. Kirk asked Ms. Edgett if he could attend a meeting scheduled with Dr. McKinley. Ms. Edgett refused and shared her views with the Board, claiming that, "[i]f Brian Kirk [came], it [would] be a shit show."

89.    In response to Mr. Kirk's December 15, 2022 letter to the Board, NCH put Mr. Kirk on administrative leave for one month.

90.    After the special meeting held in December 2022, Ms. Edgett disinvited Mr. Kirk and his wife from the NCH Annual Holiday Party that they had planned to attend.

91.    This act humiliated Mr. Kirk and his wife. It was extremely embarrassing to be shunned from an event that he had always been a part of as he had served as the MC for the event

in the past. As a further detraction of Mr. Kirk's authority, on December 16, 2022, Ms. Edgett took over the event, told Mr. Kirk and his wife not to attend the event, and distributed the awards to employees herself.

92.     Mr. Kirk experienced substantial reputational harm as Becker's Hospital Review picked up on the news of Mr. Kirk's reinstatement after he returned from administrative leave.  Mr. Kirk was reinstated in January of 2023 with no explanations, conclusion, or rationale shared by the Board for their administrative leave imposed on Mr. Kirk.

93.     Upon Mr. Kirk's return from administrative leave, he again urged NCH to self-report the potential Stark Law violations.

94.     As further evidence of harassment, NCH put Mr. Kirk on a performance improvement plan (PIP).

95.     The PIP did not state any weaknesses in Mr. Kirk's performance or leadership styles. Instead, it presented a laundry list of best practices for hospital CEO's. Relatedly, much of the items on the list were practices that Mr. Kirk had already exercised, such engaging with the community, the industry and working closely with the NCH Board.

96.     Mr. Kirk's PIP was stated to be in place from May until September of that year. Yet, despite Mr. Kirk having placed NCH in a break-even position for the fiscal year, and despite Mr. Kirk following the guidance on the plan, Mr. Kirk was terminated before the first month of the PIP.

97.     On May 16, 2023, in a letter to the Board, Mr. Kirk reminded NCH of the compliance risk related to Stark Fraud and Abuse for overpayment to physicians. In the letter, he stated that the hospital "[s]till [had] a major compliance risk at NCH, namely Stark Fraud and

Abuse for overpayment to physicians." **Exhibit 9, Mr. Kirk's May 16, 2023, Letter to the NCH Board**.

98.     In the same letter, Mr. Kirk also reiterated that Ms. Edgett was in violation of KOMA.

99.     On or about May 17, 2023, just one day after Mr. Kirk wrote to the Board highlighting the compliance risks in writing for the third time, he was issued a Notice of Termination of Employment without cause.

100.    NCH granted Mr. Kirk a 90-day notice but instructed Mr. Kirk to immediately vacate the premises upon receipt of the notice. At this time, Ms. Edgett asked Mr. Kirk to leave during a live streamed Board Meeting, and publicly requested that NCH Board members collect Mr. Kirk's badge, keys, and computer and escort Mr. Kirk out of the premises.

101.    Far from remedying its conduct in response to Mr. Kirk's complaints, NCH forged forward in terminating Mr. Kirk's CEO position 90 days following their notice, on August 15, 2023.

102.    As a result of NCH's retaliation, Mr. Kirk suffered, and continues to suffer substantial economic damage, reputational damage, and emotional distress.

   **D.  NCH's Termination of Mr. Kirk was Pretextual.**

103.    NCH's stated reason for terminating Mr. Kirk was pretextual. The overall evidence detailed in this Complaint demonstrates a strong causal connection between Mr. Kirk's termination and his act of reporting NCH's Stark Law violations.

104.    In September 2022, Mr. Kirk reported his concerns to members of the Board, who had the power and duty to investigate and address any compliance issues. In response, the Board

retaliated against Mr. Kirk, culminating in his wrongful termination. **EXHIBIT 10**: **Mr. Kirk's email to the Board dated 9/30/22.**

105.    The sudden change in the Board's attitude occurring almost at the exact time when Mr. Kirk reported his Stark Law concerns to the Board demonstrates pretext or animus against Mr. Kirk for engaging in protected activity.

106.    The hostile work environment continued. In or about November 2022, Ms. Edgett instructed Mr. Kirk to attend a workshop called "Understanding Disruption."

107.    Mr. Kirk heeded the request, concerned that he would lose his job as the CEO of NCH. When Mr. Kirk attended, he discovered that he was placed in a group study with 7 or so physicians who were engaged in improper relationships and/or sexual activities with patients or nurses. Mr. Kirk found that this workshop had no applicability to his situation.

108.    Mr. Kirk had never engaged in such conduct, was never even accused of such conduct, and it was clear that the workshop was not meant for him.

109.    After the workshop, colleagues warned Mr. Kirk that Ms. Edgett was trying to get rid of him and informed him that Ms. Edgett had made a call to Dr. Scott Stacy, co-founder and President of the Acumen Institute, on multiple instances before and after the training.

110.    The next week, Ms. Edgett contacted Mr. Kirk by phone and said that she had personally contacted Dr. Stacy and enrolled him in the Acumen Institute's Understanding Disruptive Behavior workshop. Ms. Edgett informed Mr. Kirk that he needed to enroll in the pre-workshop assessment and interview. When Mr. Kirk raised with Ms. Edgett that the workshop was inapplicable to him, Ms. Edgett simply responded that it did not matter.

111.    Mr. Kirk responded that he did not think reporting the truth about Stark fraud constituted creating a "Disturbance" for NCH and Ms. Edgett again, simply stated that it did not matter.

112.    A few days after completing the Acumen Disturbance training, Mr. Kirk received an unexpected call from Dr. Scott Stacy. Dr. Stacy informed Mr. Kirk that he had received a call after the session from Ms. Edgett. Dr. Stacy said that it was extremely rare for him to receive a call such as this, and he felt compelled, as a professional courtesy, to let Mr. Kirk know of this incident and advised Mr. Kirk to be careful and protect himself as much as possible.

113.    At the November Board meeting, during open session, the NCH Board interrogated Mr. Kirk about his Disturbance training. It was inappropriate to discuss personnel matters of non-elected personnel in an open session. The Board continued with the regular meeting agenda but did not directly address Mr. Kirk's written grievance.

114.    In December 2022, the Board reviewed Mr. Kirk's letter to the Board raising potential Stark Law violations. At the Board meeting, NCH placed Mr. Kirk on administrative leave. NCH forced Mr. Kirk off the premises and banned him from the annual holiday party that was scheduled for the next day.

115.    Mr. Kirk had no other explanation for why he was being treated this way, except because he had engaged in protected activity for the past three months.

116.    During the administrative leave, Mr. Kirk experienced reputational harm as Becker's Hospital Review published news of Mr. Kirk's reinstatement after he returned from administrative leave. This prompted people in the community to reach out to Mr. Kirk and inquire about his circumstances and position with NCH.

117.    Upon Mr. Kirk's return from administrative leave, Mr. Kirk continued to urge NCH to self-report the potential Stark Law violations.

118.    On or about May 16, 2023, in a letter to the Board, Mr. Kirk reminded NCH of the compliance risk related to Stark Fraud and Abuse for overpayment to physicians. In the letter, he stated that the hospital "[s]till [had] a major compliance risk at NCH, namely Stark Fraud and Abuse for overpayment to physicians."

119.    He also directly raised that the hospital "violated Stark Fraud and Abuse provisions as [he had] communicated this to the executive committee members Ms. Edgett and Mr. Fischer and these three doctors at our meeting on August 1, 2022."

120.    Mr. Kirk also indicated in his May 16, 2023, letter that he had communicated these concerns to executive committee members Ms. Edgett and Mr. Fisher in a meeting on August 1st, 2022, and in writing on October 5th and December 15th.

121.    In the same letter, Mr. Kirk also reiterated that Ms. Edgett was in violation of KOMA.

122.    Despite Mr. Kirk's advice, Ms. Edgett continued to let the doctors maintain their agreement.

123.    On May 17, 2023, just one day after Mr. Kirk wrote to the Board highlighting the compliance risks in writing for the third time, he was issued a Notice of Termination of Employment without cause.

124.    NCH condoned a culture of Stark Law violations because not doing so may harm physician relations and ultimately affect NCH's profits, thus giving rise to a motive to retaliate against an employee who failed to play by NCH's unwritten rule.

125.    When it became clear to Board members, including but not limited to former President Edgett, former Vice President Fisher, Secretary Braun, and Treasurer Vollersten, that Mr. Kirk would not condone NCH's wrongful conduct, Defendant retaliated by falsely accusing Mr. Kirk of underperformance, putting him on administrative leave, damaging his reputation, and subsequently terminating him.

126.    Mr. Kirk immediately experienced retaliation after he first raised concerns with NCH about its non-compliance with Stark Law, including being placed on administrative leave.

127.    Within only eight months of raising concerns, the ultimate act of NCH's retaliation was Mr. Kirk's termination.

## COUNT I
## RETALIATION IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31  U.S.C. § 3730(h)

128.    Plaintiff restates and realleges the allegations contained above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

129.    The Federal False Claims Act, 31 U.S.C.§ 3730(h)(1) provides that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

32 U.S.C. § 3730(h)(1).

130.    Defendant, by and through agents, violated the anti-retaliation provisions of the federal FCA by retaliating against Mr. Kirk and unlawfully terminating him for engaging in protected activities, including: (1) Internal reporting of NCH potentially violating the Physician Self-Referral Statute (commonly referred to as the Stark Law), 42 U.S.C. § 1395nn; (2) Advising

NCH to follow the federal law and the applicable rules and regulations governing Medicare patient referrals and compensation arrangements for physicians employed by the hospital; and (3) Objecting to NCH's violations of the Stark Law.

131.    As a result of Mr. Kirk's lawful acts in furtherance of protected activities in the investigation and internal reporting of fraud and attempts to stop one or more violations of the FCA, and NCH having notice thereof, NCH retaliated against Mr. Kirk, ultimately discharging him.

132.    NCH's adverse actions stemmed from Mr. Kirk's three written notices on October 5, 2022, December 14, 2022, and May 16, 2023, against NCH engaging in conduct that violated the Stark Law.

133.    Almost immediately after Mr. Kirk raised concerns with the non-compliant employment agreements, Mr. Kirk faced retaliatory conduct from NCH and various Board members who disagreed with Mr. Kirk's compliance focused actions.

134.    Retaliatory conduct included, but not limited to, diminished job responsibilities, hostile and oppressive work environment, and termination.

135.    Mr. Kirk explored alternative solutions and means of addressing the level of retaliation he faced by reaching out to the Board, but his concerns were rebuffed and ignored.

136.    The retaliation Mr. Kirk faced caused him severe anxiety and emotional distress, taking a massive toll on his physical and mental health.

137.    Mr. Kirk's termination of employment was a direct result of NCH's retaliatory acts, causing Mr. Kirk to suffer substantial economic, compensatory, and special damages, in an amount to be proven at trial.

## COUNT II
## RETALIATION IN VIOLATION OF THE KANSAS FALSE CLAIMS ACT

**K.S.A. § 75-7506**

138.    Plaintiff restates and realleges the allegations contained above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139.    NCH violated the Kansas False Claims Act ("KFCA") by unlawfully retaliating against him after Plaintiff complained about potential Medicare and Medicaid violations.  Like its federal counterpart, the KFCA also contains an anti-retaliation provision to protect whistleblowers. Section 75-7506 provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed or in any other manner retaliated against in the terms and conditions of employment by such employee's employer because of unlawful acts undertaken in good faith by the employee on behalf of the employee or others, in furtherance of an action under this act, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this act, shall be entitled to all relief necessary to make the employee whole. An employee may bring an action in the appropriate district court for the relief provided in this section.

140.    Defendant, by and through agents, violated the anti-retaliation provisions of the KFCA by retaliating against Mr. Kirk and unlawfully terminating him for engaging in protected activities, including: (1) Internal reporting of NCH potentially violating the Physician Self-Referral Statute (commonly referred to as the Stark Law), 42 U.S.C. § 1395nn; (2) Advising NCH to follow the federal law and the applicable rules and regulations governing Medicare patient referrals and compensation arrangements for physicians employed by the hospital; and (3) Objecting to NCH's violations of the Stark Law.

141.    As a result of Mr. Kirk's lawful acts in furtherance of protected activities in the investigation and internal reporting of fraud and attempts to stop one or more violations of the KFCA, and NCH having notice thereof, NCH retaliated against Mr. Kirk, ultimately discharging him.

142.    NCH's adverse actions stemmed from Mr. Kirk's written concerns about NCH engaging in conduct that violated the Stark Law.

143.    Almost immediately after Mr. Kirk raised concerns with the non-compliant employment agreements, Mr. Kirk faced retaliatory conduct from NCH and various Board members who disagreed with Mr. Kirk's compliance focused actions.

144.    Retaliatory conduct included, but not limited to, diminished job responsibilities, hostile and oppressive work environment, and termination.

145.    Mr. Kirk explored alternative solutions and means of addressing the level of retaliation he faced by reaching out to the Board, but his concerns were rebuffed and ignored.

146.    The retaliation Mr. Kirk faced caused him severe anxiety and emotional distress, taking a massive toll on his physical and mental health.

147.    Mr. Kirk's termination of employment was a direct result of NCH's retaliatory acts, causing Mr. Kirk to suffer substantial economic, compensatory, and special damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendant as to Counts I and II, and for the Court to award:

(a) Plaintiff, all allowable damages, interest, fees and costs resulting from Defendant's retaliation, including double his lost pay and benefits, and other compensatory damages;

(b) Plaintiff, his litigation costs, expenses, and reasonable attorney's fees; and

(c) Such other relief as the Court may deem just and proper.

## COUNT III
## COMMON LAW RETALIATORY DISCHARGE

148.    Plaintiff restates and realleges the allegations contained above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

149.    Defendant, by and through its agents, retaliated against Mr. Kirk and unlawfully terminated him for engaging in protected activities, including: (1) Internal reporting of NCH potentially violating the Physician Self-Referral Statute (commonly referred to as the Stark Law), 42 U.S.C. § 1395nn; (2) Advising NCH to follow the federal law and the applicable rules and regulations governing Medicare patient referrals and compensation arrangements for physicians employed by the hospital; and (3) Objecting to NCH's violations of the Stark Law.

150.    As a result of Mr. Kirk's lawful acts in furtherance of protected activities in the investigation and internal reporting of fraud and attempts to stop one or more violations of the FCA, and NCH having notice thereof, NCH retaliated against Mr. Kirk, ultimately discharging him.

151.    NCH's adverse actions stemmed from Mr. Kirk's outspoken stance against NCH engaging in conduct that violated the Stark Law.

152.    Almost immediately after Mr. Kirk raised concerns with the non-compliant employment agreements, Mr. Kirk faced retaliatory conduct from NCH and various Board members who disagreed with Mr. Kirk's compliance focused actions.

153.    Retaliatory conduct included, but not limited to, diminished job responsibilities, hostile and oppressive work environment, and termination.

154.    Mr. Kirk explored alternative solutions and means of addressing the level of retaliation he faced by reaching out to the Board, but his concerns were rebuffed and ignored.

155.    The retaliation Mr. Kirk faced caused him severe anxiety and emotional distress, taking a massive toll on his physical and mental health.

156.    Mr. Kirk's termination of employment was a direct result of NCH's retaliatory acts, causing Mr. Kirk to suffer substantial economic, compensatory, and special damages, in an amount to be proven at trial.

157.    At all times, Mr. Kirk followed the directives of the NCH Board to bring the hospital back to breakeven financial results.  Mr. Kirk was also required by his licenses and his duties as CEO to maintain compliance with all Federal and State rules and regulations.  When Mr. Kirk alerted the NCH Board to his concerns, they broke their own policies, and started a period of harassment, retaliation, and punishment. This included, but was not limited to, two days of "disturbance training," a month of administrative leave where Mr. Kirk was escorted out of the facility minus his badge, keys, computer, and access, Mr. Kirk and his wife, Stephanie were disinvited to the hospital Christmas party and annual service awards banquet, Mr. Kirk was placed on a performance improvement plan that started in May and was to end in September of 2023, and ultimately, Mr. Kirk was terminated "without cause" on May 17, 2023.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendant as to Count III, and for the Court to award:

(a) Plaintiff, all allowable damages, interest, fees and costs resulting from Defendant's retaliation, including double his lost pay and benefits, and other compensatory damages;

(b) Plaintiff, his litigation costs, expenses, and reasonable attorney's fees; and

(c) Such other relief as the Court may deem just and proper.

Dated:  September 6, 2024

Respectfully submitted:

*/s/ Robert B. Sullivan*
Robert B. Sullivan (Kansas Bar # 6809)
**SANFORD HEISLER SHARP, LLP**

17 State Street, 37th Floor
New York, New York 10004
Telephone: (816) 309-6840
Facsimile: (646) 402-5651
Email: rsullivan@sanfordheisler.com

Sarah Chu*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300,
Washington, DC 20003
Telephone: (202)-499-5200
Facsimile: (646) 402-5651
Email: schu@sanfordheisler.com
*Pro hac vice* forthcoming

*Attorneys for Plaintiff Brian Kirk*