# NCH NORTON COUNTY HOSPITAL

December 15, 2022

NCH Board of Trustees
102 E. Holme
Norton, Kansas 67654

Dear Board,

    I am writing to let you know I am happy to be here and can help solve our present crisis. My wife was born in this hospital and our family members are lifelong residents. Norton County Hospital was one of my first audit clients when I worked for BKD out of Wichita. I came here to retire here. We bought a house in Norton County and I accepted a low salary when I started, because I saw the financial position of the hospital and felt NCH could not afford more. I am pleased to bring my 30 years of Healthcare Experience to bear to help NCH through these difficult times. As CEO, I previously guided Sheridan County Health Complex from a "going concern" audit opinion (this means the hospital was on the verge of closing) to financial solvency. After 5 years, we moved South to accept a position with more opportunity for professional growth. In my experience as VP of Physician Practices for both Lafayette General Health System and Lake Charles Memorial Health System (5,000 employees and 3,500 employees, respectively) I worked with hundreds of physician employment agreements, recruiting, retention, and management issues. I can help you solve the problems we are facing at NCH, but I need your support.

    We have made great improvements ($1M plus) since our last FY loss on operations of $2.67M, but we still have more work to do! NCH is running out of cash. As of November 30, 2022 we are down to $391,430 of operating cash, which is 8 days operating cash on hand. This amount will only cover one by-weekly payroll. Through 5 months of our current fiscal year, NCH has already lost over $1M dollars.

    One big problem is our three doctors refuse to comply with their employment agreements. Per contract, they are required to provide nine hours per day, four days per week patient contact hours in our clinic. They don't. When asked to comply, they get angry and threaten those who speak to them about it. They have not been held accountable in the two years they have been here. As a result, our Rural Health Clinic is losing over $100,000 per month, driven by our three doctors not wanting to see more than eight to ten patients per day. One of the biggest complaints of our community is not being able to be seen in our clinic. It is affirmed by our own employees. This problem is evidenced by the fact that our two clinic Advanced Practice Providers (APP's) combined, see more patients than these three physicians (Drs. Neill, McKellar, and Gaede). This problem is further evidenced by Clinic Manager, Avery Aiken's report of hours which I previously sent to the Board via email months ago.

These reports demonstrate that last fiscal year, all four of our physicians (including Dr. Maurer for half the year from July 1 to December 31) only worked in the Clinic for a total number of hours equivalent to 1.09 FTE's. The fact that NCH paid these 1.09 FTE physicians more than $1.6M in Salaries, wages, and benefit compensation it appears to create two problems: 1. Possible Stark Fraud and Abuse concerns that we are substantially overpaying our doctors for the amount of work they are actually doing; and 2. NCH cannot afford to pay these amounts and stay in business; we are running out of cash. An additional Stark Fraud and Abuse concern is paying doctors for inpatient and ancillary services provided. This action was affirmed by both the Clinic Manager and our Chief of Staff who both claimed in open board meeting and executive committee meetings that NCH is indeed paying our doctors for inpatient admissions and ancillary revenues. I brought these potential Stark violation to the Board's attention in a written Grievance dated October 5th and to date I have not received any response. Further, upon my hire by this Board I was promised annual market and cost of living adjustments. Every other employee of this hospital received these adjustments which averaged 10% increases. My anniversary date of employment was October 18, 2022 and I did not receive what was promised.

Last April and May, we brought in two independent consultants, Bill Bellenfant and Medical Practice Advisors. Both reported that our current physician employment situation with three doctors was unsustainable. Since that time we added a fourth doctor, our native son, Dr. Dakota Dreher. As previously shared and discussed, CMS minimum threshold for annual visits are 4,200 for a doctor and 2,100 for APP's. With last year's patient load of 10,341 clinic visits, considering the minimum thresholds, this volume should be covered by two doctors and one midlevel. We currently have four doctors and two APPs working full time in the clinic. Further, we have two additional APP's working the Emergency Room, so our three Doctors are only providing primary ER coverage one day per month. For CAH's it is usual and customary for physicians to cover the ER. This also plays into the Stark Fraud and Abuse concern since our three doctors are each being paid $415K with minimal ER coverage. It is hard to justify given the lack of coverage and lack of patients seen from both Stark and business perspectives.

## Ongoing Kansas Open Meetings Act (KOMA) possible violations?

Over the summer the Board met several times developing an action plan and strategy related to the three physician employment agreements. The Board directed our legal counsel to draft new agreements for me and the Executive Committee to present to the doctors. I got to the meeting that was on or about Monday, August 1st, with contracts in hand. When Board President, Jill Edgett got there, she informed me we are not handing out the agreements. I asked why, since the Board made a unanimous decision for our legal counsel to draft them and for us to deliver them. Jill responded that she had communicated individually with all the Board members and that they had collectively changed their mind. It doesn't seem that KOMA allows a hospital Board to make decisions or change direction in this manner, outside a regular meeting. Further, after that same meeting when the doctors left, Jill proceeded to tell me, "The managers don't appreciate my leadership." I asked what she meant and she said, "you don't trust some of your leaders." I asked for more details and she said, "she could not reveal her sources," to which I replied, "I have no idea what you are talking about. I would like to improve, but unless you give me something more specific, there is no opportunity for me to know how I can do better." Then, Jill proceeded to tell me that, "I asked for an additional quote for our legacy computer system." I said, "yes, I did. I received an email from a vendor who worked with Cerner

who said they were the most economical and best, so I asked Klare Bliss, CIO, to follow up and get another quote." Jill said, "Klare had already made her decision." I replied, "but neither the Board or I have made our decisions and I want to get the highest value for the hospital." This whole incident is and was a violation of our NCH grievance policies and a demonstration of insubordination by Klare. I have been told by numerous people that Klare has been complaining and talking hospital business with Jill at her Church on a regular weekly basis. Parishioners are hearing these conversations and are sick of it. These are ongoing violations of NCH policies, procedures, and values by both Klare and Jill.

## Governance vs. Management:

At the last Board meeting, November 16th, Jill called for an executive session with the full Board, CEO, and HR Director. During that meeting the President directed me and our HR Director to terminate the Clinic Manager. I was also directed to inform Dr. Neill, who is managing the ER schedule to not create a schedule causing extra payments to our APP's. She directed us to tell Dr. Neill that she should follow the employment agreements for the APP's and Dr. Dakota Dreher. The Board came out of executive session and adjourned, not giving their directives in open session. This seems to be another KOMA violation because Kansas Boards cannot make decisions in secret. This is also another demonstration of Jill moving out of governance into management. As part of carrying out the directive regarding the clinic manager, I informed our Medical Staff. I received such push back that I informed our Board via email and advised against it at this time. When I spoke with our Chief of Staff, he said that he would confirm this directive with Jill. In a subsequent conversation with Dr. Gaede, he indicated that Jill did not confirm the directive of the Board, which is concerning.

When I attended the Kansas Hospital Association (KHA) annual convention in Kansas City in September, Klare, in conjunction with Jill, called for a special Department Manager meeting. I was there receiving our hospital award for teamwork relating to our Employee Recruiting and Retention Committee. I was also elected onto the KHA Board for a new three year term. This meeting was called without either Klare or Jill informing me. I received an email meeting invitation as did all twenty-nine other Managers and Directors. I started receiving text messages, Telemediq, and phone calls alerting me that a "mutiny" was happening that that word on the street was that they were planning a "CEO bash session" in my absence. Initially I let it go, but the more communications I received I called Rich Miller and Garrett Beydler, County Commissioner. Jill is angry with me that I decided to reach out to others to inform them of this blatant interference with the management of this hospital. She does not understand what the 'big deal' is about. Jill created a huge division within the Hospital. I don't think Jill understands how harmful this behavior is, in undermining my authority to manage the hospital or the strife she has created for our employees.

It seems there is an inappropriate relationship between Jill and Klare. Another example is evidenced by the fact that Klare wrote a grievance on me which, based on an investigation by Human Resources and our legal counsel turned out to be completely unsubstantiated and no probable cause. Yet, I was sent to an "Understanding Disturbances" two day course on November 10 & 11th by you all without ever hearing my side of the story. It also seems inappropriate that you all held an executive session with only you and Klare present. There was no legal counsel present, no one from human resources or administration were there. Klare was allowed to meet with you all for half an hour and I wasn't even allowed to hear her accusations.

Jill is creating another unnecessary and dangerous division between our doctors and our Advanced Practice providers. This is evidenced by her continuous meetings with the doctors and never meeting any APP's. It is further evidenced by Jill's inserting herself in the ER scheduling conflict. We have asked Jill to include all medical staff, but she refuses. It appears the doctors are attempting to drive away our APP's seemingly for job security and that Jill has sided with the doctors. We are in risk of losing our APP's and that would be detrimental to our precarious financial position. In my opinion, Jill should not be meeting with the doctors like this and we all know Jonna resigned yesterday. Jonna said she did not think Kristin will last long and will also quit. It seems Jill has empowered the doctors to bully and intimidate all of our APP's. This is clearly evidenced by Dr. Neill assigning Gino Salerno to work one hundred and ninety-two hours in a recent two week period, after I asked her not to do that. She is not following Gino's employment agreement, which stipulates only seventy-two hours per week. It is also evidenced by Dr. Gaede's email attack on Jonna & Kristin. The straw that broke Jonna's back is that the doctors developed a "deficiency list" of her "poor performance," that included pictures of sharps she allegedly left behind exposing patients and employees and other things. Jonna told me, "when the doctors started threatening my license to practice with this list, she decided enough was enough and quit. They were mean."

Jill now seems to be both negotiating and managing the current three physician contracts. Jill has requested a FMV opinion from outside legal counsel. This study requires a $4,000 deposit and is estimated to cost between $8-$10,000. Did the Board authorize Jill to act in this capacity? I did not ever hear such authority approved in open session during our meetings. Is the Board President unilaterally able to authorize a NCH commitment of $8-10K? Is this a KOMA issue? Jill does not have experience in physician contracting and this is not a board function. This is the responsibility of the CEO. I have extensive experience in these matters.

**The Solution:**  One solution is pretty simple. The only way to keep all three doctors in practice here at Norton Medical Clinic is to renegotiate their employment agreements to financially align them with the hospital and clinic and to keep them in fair market value with MGMA guidelines. Put them on a "pay for what they produce model." Historically here at NCH it worked with Dr. Maurer who worked for a base of $140K plus productivity bonus for 24 years. It also worked for Dr. Marty Griffey, who worked for a base of $185K plus productivity, who was able to earn what our 3 doctors are presently making. The Board directed our legal counsel to negotiate these contracts and our Board President keeps stepping in the middle of the negotiations. At a Board Meeting many months ago, Board Member Corey Roy, aptly pointed out that the longer one drags out an employment contract negotiation, the worse things get. That proves prophetic as our three doctors lobbied the community, our board, and the county commissioners alleging: 1. they are being run out of town; & 2. We are cancelling OB. They used the public and social media as political leveraging against NCH and that was unethical. These doctors insist that they don't need to follow their current contracts and they will not take a cut in pay. They have also stated that the County can pay more taxes and subsidize their lack of patients and pay their salaries.

I'd also like to bring to your attention that I have had Barbara Lorsback, President of GovernWell on standby to visit with our NCH Board for the last two month's regular meetings in October and November (and she is standing by for December 21st as well) to help educate the Board

on management vs. governance, Kansas Open Meetings Act, and Stark Fraud & Abuse. This is a free service afforded by our membership in the Kansas Hospital Association. Jill has rejected all of this training to date. I want the full board to know and be involved in this decision. In addition, Rich, got permission from Jill to interview our entire medical staff and managers. He requested to present his findings, which were favorable to my leadership, to the full Board, but was only allowed to report to the executive committee. Jill indicated, "she will take it under advisement." I respectfully request the full Board hear from Rich, please. Rich and Garrett Beydler both requested to come to the special Board meeting scheduled for December 13th and were both told by our President they could not attend. The entire meeting would be executive session. I do not understand why Jill would not want the full board to hear from our former forty-year Administrator and current county commissioner hospital liason on these important issues. They could bring value to the conversations and be admitted to the executive session.

In conclusion, I have been telling you all year we are going to run out of cash. We hired too many doctors too fast. Our 10,341 clinic visits and Average Daily Census of three patients per day (one acute and two skilled) cannot support a medical staff of four doctors and four APP's. The future and fate of Norton County Hospital is at stake. Jonna has been a valuable employee of NCH who averaged 4,000 clinic visits per year. That represents about $400K annual loss of revenues. Kristin sees on average 1,800 clinic visits per year. Together, that is half of the clinic revenues. This fiscal year NCH is losing an average of $200K per month. It seems we need to begin cost cutting measures as soon as possible. I'm committed to helping resolve these issues and save NCH. I appeal to each of you to work with me on these matters and let me do my job. We can fix this. Your support is needed and appreciated.

Sincerely,

Brian Kirk,
Chief Executive Officer