# NCH
# NORTON COUNTY HOSPITAL

May 16, 2023

**RE: Updates & Stark Fraud & Abuse – Recommendation to Self-Report**

Norton County Hospital Board of Trustees:

It is good news that NCH broke even during April and with the changes that have been made, we will continue to see financial improvements. You have expressed concerns about whether NCH will need to hire new doctors after the resignations of three doctors. With our Average Daily Inpatient Census of 3 patients, clinic visits of 10,341 annually, and average daily ER visits of 4, we can maintain this workload with our current medical staff based on past productivity:

Jeff McKinley can see 5,000 patients for the year;
Jonna Inman can see 4,000 patients for the year;
Kristin Vogel can see 2,100 patients for the year.
These 3 providers can cover 110% of our prior year total clinic visits, based on their past productivity and we still have Dr. Dreher.

The ER is covered 71% of the time by Gino Salerno and Rebecca Khars: 5 out of 7 days. We can manage all NCH volumes with 2 doctors and 4 midlevels.

It was reported in the Norton Daily Telegram "Spring 2023 Rural Health edition" that Sheridan County Health Complex generates more revenues with less medical staff than NCH. Graham County Hospital also produces more revenue than NCH with only 2 doctors and 2 Advanced Practice Providers (APP's). Graham County Hospital is also profitable.

We still have a major compliance risk at Norton County Hospital, namely Stark Fraud and Abuse for overpayment to physicians. The penalties that could be assessed might be more than our current NCH capacity due to the draining our cash and investments over the past ten years. As of April 30, 2023, we only have cash and investments of $1.7 Million remaining.

It is disappointing that our Board of Trustees would choose to meet without my representation as the Chief Executive Officer. Jill Edgett notified me by email at 12:42 p.m. on Thursday, May 4th, that there would be a special board meeting that same evening at 6:30 p.m. I was out of town for our Sunflower Health Network Board meeting. I am the current vice-president of that consortium of 28 critical access hospitals and Salina Regional. Jill informed me that the agenda was executive session

with the board and attorneys only. I made several inquiries and offered to be present via email, which were not responded to.

I was told that there were no motions made at that meeting and no decisions made. However, the very next morning, I received an email from Frankie Forbes saying, ***"the Board authorized the engagement of Kevin McAnaney to assist with compliance issues. The hourly rate was discussed and approved by the Board. Please execute the attached and return to me."*** This communication begs several questions:
1. Why was I not included in the special Board meeting the night before if it was about compliance issues?
2. How can the Board authorize the engagement of Kevin McAnaney during a special meeting, 100% executive session without a motion? This appears to be a Kansas Open Meeting Act Violation.
3. Per review of the engagement letter, the hourly rate is $600 per hour. In his email, Frankie asserts this hourly rate was also discussed and approved by the Board.
4. Why would I be asked to sign the engagement letter if I was purposefully excluded from the meeting?
5. Was the engagement letter signed?

I do not think signing this engagement letter is a good course of action because:
A. If the Board and legal counsel think NCH violated Stark Fraud and Abuse provisions, I recommend NCH should self-report. I think we can expect more leniency and clemency in doing the right thing.
B. I think we have violated Stark Fraud and Abuse provisions as I communicated this to the executive committee members Jill Edgett and Ron Fisher and these three doctors at our meeting on August 1, 2022. I also put my concerns in writing on October 5th and again on December 15, 2022 and today.

## False Claims Act (FCA):

The civil FCA protects the Government from being overcharged for services. The fact that for thirty (30) months, we paid these three doctors $1,338,150 for approximately 2,290 hours of combined work that year could be deemed fraudulent. In addition, we paid $355,000 in one year for an APRN. These facts are clearly seen in our cost report filing for FYE 6/30/22, in particular worksheets M-1 and M-2 which I have attached for your reference. When CMS does their desk review of this report, I think this will likely cause them to ask us why we paid so much for low volumes and they will readily conclude we paid above Fair Market Value. This could potentially trigger Stark Fraud and Abuse and FCA. If we have not self-disclosed, this could end up closing Norton County Hospital due to the substantial fines and penalties. These salaries are off the charts per the Kansas Hospital Association salary survey that year. Further, CMS will review the time studies of their hours worked which was less than their contractual commitment.

Filing false claims may result in fines of up to three times the programs' loss plus $11,000 per claim filed. If CMS calculates the program loss over the 30 months was $1M, then that fine would be $3M. If they assessed the fine on all the claims for our FYE 6/30/22 cost report, that could be 10,341 claims x $11,000.

## **"STARK" law:**

"Stark" law is triggered even if the prohibited financial relationship is the result of inadvertence or error. Knowing violations may result in the exclusion from the Federal health care programs. This goes for the hospital, board, administration, and doctors. Because of your refusal to listen to me and appropriately address my concerns, you are putting NCH in jeopardy.

Stark law requires that employed physicians must be paid at FMV. As I have been saying for the past year, NCH did not pay FMV for the 3 physician's employment agreements. This is evidenced by:

1. Coker Group recently asserts FMV as $280K. I was not included in this final determination number. I heard it disclosed at our NCH Board meeting. I think their determination is too high base on:
   - It assumes they are working fulltime, and they are not, as evidenced by their time studies;
   - A safe harbor for employment agreements is +or- 5% of their actual collections.
2. Dr. Dreher accepted $285K in an employment agreement dated September 15, 2021.
3. Dr. McKinley accepted $300K in an employment agreement this year and he has 12 years of experience.
4. KHA physician salary survey says the highest paid rural doctor in the State last year was paid $355K
   A. Dr. Gaede was paid $512K his first year, including the SCHC payout and $415K.
   B. Dr. Gaede was paid $30K per year for education stipend that NCH paid off and NCH never validated per his employment agreement.
   C. Drs. Neill & McKellar were paid $415K per year.
   D. All three of these doctors were coming out of residency with no previous experience.
   E. All three of these doctors are required per their employment agreements to provide 36 hours per week of patient care. None of them achieved 36 hours per week based on the time studies prepared by Avery Aiken, former clinic manager and submitted to Forvis for the cost report and Coker Group for their FMV analysis.

In summary, in my opinion, CMS is going to find out about these physician arrangements. I think it is better to self-report and request clemency and hope for a slap on the wrist. If CMS finds out and we haven't reported, it could mean the end of Norton County Hospital, due to the potential fines and penalties. Our insurance will not cover fines. It is too big a risk not to report. I look forward to discussing in more detail at our meeting tomorrow.

Sincerely,

*[signature: Brian Kirk]*

Brian Kirk,
Chief Executive Officer