## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| BRIAN KIRK, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 24-2405-KHV |
| | ) | |
| NORTON COUNTY HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On September 6, 2024, plaintiff filed suit against his former employer, Norton County Hospital. Plaintiff asserts that in violation of the False Claims Act, 31 U.S.C. § 3729 et seq. (Count I), the Kansas False Claims Act, K.S.A. § 75-7501 et seq. (Count II) and Kansas common law (Count III), defendant terminated his employment in retaliation for reporting potential violations of federal and state law. See Complaint (Doc. #1). This matter is before the Court on Defendant's Motion To Dismiss (Doc. #7) filed November 6, 2024. For reasons stated below, the Court sustains defendant's motion in part and overrules it in part.

## Legal Standard

In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.  See id.  Plaintiff bears the burden of framing his claims with enough factual matter to suggest that he is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  See Twombly, 550 U.S. at 556.  Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendant is liable for the alleged misconduct.  Iqbal, 556 U.S. at 678.  Plaintiff must show more than a sheer possibility that defendant has acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendant's liability.  Id. (quoting Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Id.  Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

In evaluating a motion to dismiss under Rule 12(b)(6), the Court can consider not only the complaint, but also exhibits and documents which the complaint attaches and incorporates by reference.  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).

## **Factual Background**

Highly summarized, plaintiff's complaint alleges as follows:

Defendant is a "Critical Access Hospital," providing a full range of medical services to patients in Norton County, Kansas and surrounding northwest Kansas and southwest Nebraska

communities.[1]

## I.    Defendant's Financial Situation

In September of 2021, defendant appointed plaintiff its Chief Executive Officer ("CEO"). When defendant hired plaintiff, it was in a dire financial situation. Defendant tasked plaintiff with significant responsibilities to curtail financial spending, including to stop the hemorrhage of defendant's cash. Plaintiff immediately implemented cost-reduction efforts, including changes to nursing staff ratios and eliminating non-essential positions. Between October of 2021 and April of 2022, plaintiff made substantial improvements to defendant's financial situation. For those eight months, the Norton County Hospital Board of Trustees held plaintiff in high esteem and awarded him consistently high performance reviews.[2]

By April of 2022, plaintiff had discovered serious problems with defendant's staffing and compensation agreements. First, defendant was extremely overstaffed for the number of patients.[3] For example, by the end of June 30, 2022, defendant reported 10,381 medical clinic patients. Two doctors and one mid-level practitioner could have adequately treated this number of patients, but defendant had five doctors and two mid-level practitioners doing so. Second, plaintiff identified three physicians—Dr. Joshua Gaede, Dr. Miranda McKellar and Dr. Theresia Neill—whom defendant was paying above fair market value, despite the low number of patients they saw.

---

[1]    "Critical Access Hospital" is a designation by the Centers for Medicare & Medicaid Services to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communities.

[2]    The Board governs defendant's staff, including its active medical staff, administrators, departmental supervisors and other employees.

[3]    As a Critical Access Hospital, defendant had to maintain certain staffing standards in three primary areas: the medical clinic, hospital inpatients and the emergency room. Plaintiff does not allege the exact number—or ratio—of doctors that it needed to be compliant with its designation.

Defendant paid Dr. Gaede a salary of $513,000 for his first year of employment and then $415,000 per year. Defendant paid Dr. McKellar and Dr. Neill $415,000 per year. According to a 2022 physician compensation salary survey by the Kansas Hospital Association, Drs. Gaede, McKellar and Neill were the highest paid rural doctors in Kansas.

Plaintiff was concerned that the overstaffing and overpayments to physicians contributed to losses for the hospital, and that the three physicians were not fulfilling their obligation to meet the work relative value units set by their employment agreements.[4] Plaintiff learned that these three doctors were not working full time and only saw eight to ten patients per day, working less than 1,000 hours a year.

## II.    Plaintiff's Reports

Plaintiff's licenses and duties as CEO required him to maintain hospital compliance with all federal and state rules and regulations. Because defendant provides services to Medicare beneficiaries, it must operate and furnish services in compliance with applicable laws, including the Physician Self-Referral statute (commonly referred to as the Stark Law, 42 U.S.C. § 1395nn).[5] Plaintiff concluded that the compensation rates for the three physicians were not determined based on services performed and potentially violated the Stark Law, thus also implicating the False

---

[4]    A work relative value unit is a standard unit of measurement used to establish value for common health care procedures.

[5]    Congress enacted the Stark Law "to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest." U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc., 675 F.3d 394, 397 (4th Cir. 2012). The Stark Law prohibits a physician from referring Medicare patients for designated health services to an entity which the physician has a financial relationship. Complaint (Doc. #1), ¶ 46; 42 U.S.C. § 1395nn(a)(1). The statute excludes certain compensation arrangements from this prohibition, including bona fide employment relationships. See 42 U.S.C. § 1395nn(e)(2). To qualify for this exclusion, however, the employment relationship must be for identifiable services and compensation must be consistent with the fair market value of the services. Id. at § 1395nn(e)(2)(A)–(B)(i).

Claims Act.[6]

In April and May of 2022, plaintiff hired two consultants who evaluated the compensation arrangements and found that the three salaries were above fair market value. Plaintiff immediately raised the issue with the Board and proposed that it review and revise the employment agreements of Drs. Gaede, McKellar and Neill. The Board drafted and reviewed the new agreements, but the doctors refused to accept the revised terms. Instead, they encouraged the Board to terminate plaintiff's employment and verbally attacked him, calling him a narcissist and claiming that he was a terrible administrator who would destroy the hospital.

On October 5, 2022, plaintiff submitted an employee grievance report to the Board.[7] In his grievance report, plaintiff stated that by paying the doctors for inpatient admissions and ancillary services, defendant was potentially violating the Stark Law. Plaintiff attached three exhibits to his report, which provided data on the doctors' productivity and highlighted that defendant was not paying the doctors based on productivity. In addition, plaintiff reported that Jill Edgett, Board president, was creating a hostile work environment, including that (1) she stated that he was "on the short end of th[e] stick," (2) she was going to call a special board meeting "to determine facts from fiction," (3) she stripped his check signing authority, (4) she stated that he "would not be working here much longer" and (5) she and Klare Bliss called a department manager meeting while

---

[6]    The False Claims Act imposes liability on any entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A).

[7]    Plaintiff attached a copy of his grievance report dated October 5, 2022 to his complaint. An employee at Norton County Hospital may complete an employee grievance form and return the form to his or her supervisor, Human Resources or hospital administration. The form requires an employee to provide (1) the date, time and place of the event leading to their report and (2) the policies, procedures or guidelines that have been violated. See Employee Grievance Form (Doc. #1-6). Plaintiff does not allege what body is charged with investigating grievance reports, only that the defendant's policy is to respond to reports within 30 days.

he was out of town, which was a violation of defendant's chain of command.  Employee Grievance Form (Doc. #1-6) at 1–2.  Plaintiff also attached to his report his email exchanges with Edgett, demonstrating that he never advised or endorsed getting rid of any doctors.

Despite defendant's policy to respond to grievance reports within 30 days, plaintiff did not receive any response until January of 2023.  On December 15, 2022, given the Board's non-response and a noticeable escalation in hostility at work, plaintiff submitted a second letter to the Board, requesting its support to ensure that compensation levels and other revenues paid to employed physicians complied with applicable rules and regulations.  Plaintiff offered recommendations that could keep defendant in compliance with all federal and state healthcare rules and regulations.[8]

### III.    Defendant's Conduct After Plaintiff's Reports

In 2022, October through December saw growing hostility between plaintiff and the Board.  On or about October 20, 2022, Jill Edgett instructed plaintiff to enroll in the Acumen Understanding Disruption program, accusing him of engaging in disruptive behavior in the workplace.  As requested, plaintiff attended the workshop despite finding that it had no applicability to his situation.

Also in October of 2022, the Board called a special meeting with plaintiff.  During this meeting, (1) Edgett asserted that plaintiff was a poor leader who needed leadership training and that employees and community members did not like him; (2) Ron Fischer (another Board member) criticized plaintiff's hiring decisions, even though the Board had approved the hires;

---

[8]    Between October and December of 2022, plaintiff also raised concerns to the Board about violations of the Kansas Open Meetings Act and misrepresentations that defendant had made in its annual Medicare Cost report to the Centers for Medicare & Medicaid Services.

(3) Ms. Vollerton[9] (another Board member) alleged that because plaintiff is a Deacon, he discriminates against patients who are not Catholic; and (4) the Board retracted select decisions that they had previously approved.  During a monthly Board meeting in either November or December of 2022, Edgett sneered at him and whispered to plaintiff that "[the] Board [was] going in a new direction."  Id., ¶ 74.

In response to plaintiff's second letter dated December 15, 2022, defendant placed plaintiff on a one-month administrative leave.  After a special meeting that same month, Edgett humiliated and embarrassed plaintiff by disinviting him and his wife from the hospital's annual holiday party.

On January 4, 2023, defendant's legal counsel Frankie Forbes responded to plaintiff's grievance letters.  Forbes admitted that the Board was aware that "the current compensation packages for Drs. Gaede, Neill and McKellar [were] quite aggressive."  Id., ¶ 78.  Also, even though plaintiff had raised the issue with the Board in early 2022, on several different occasions, Forbes stated that "raising this issue on December 15 . . . [was] counterproductive."  Id.

In January of 2023, with no explanation for his administrative leave, the Board reinstated plaintiff.  On his return from administrative leave, plaintiff again urged defendant to self-report the potential Stark Law violations.  Defendant placed plaintiff on a performance improvement plan.  On May 16, 2023, in another letter to the Board, plaintiff reminded defendant of the compliance risk related to the Stark Law for overpayment to physicians and reiterated that Edgett had violated the Kansas Open Meetings Act, K.S.A. § 75-4317 et seq.  Also in that letter, plaintiff specifically informed the Board that defendant's compensation to the three doctors "could be deemed fraudulent," thus violating the False Claims Act.  Letter To The Board (Doc. #1-8).

The next day, May 17, 2023, defendant issued plaintiff a notice of termination of

---

[9]      Plaintiff does not provide Ms. Vollerton's first name.

employment without cause.  Defendant granted plaintiff a 90-day notice but instructed him to immediately vacate the premises.  Edgett asked plaintiff to leave during a live-streamed Board meeting, and publicly requested that Board members collect his badge, keys and computer and escort him off the premises.  On August 15, 2023, 90 days after issuing notice, defendant terminated plaintiff's employment.

On September 6, 2024, plaintiff filed suit against defendant.  Plaintiff asserts that in violation of the False Claims Act, the Kansas False Claims Act and Kansas common law, defendant terminated his employment in retaliation for engaging in the following protected activities: (1) reporting that defendant was potentially violating the Stark Law, 42 U.S.C. § 1395nn; (2) advising defendant to follow federal law and applicable rules and regulations governing Medicare patient referrals and compensation arrangements for physicians; and (3) objecting to defendant's violations of the Stark Law.  See Complaint (Doc. #1).  On November 6, 2024, defendant filed its motion to dismiss.  See Defendant's Motion To Dismiss (Doc. #7).

## Analysis

Under Rule 12(b)(6), defendant asks the Court to dismiss plaintiff's three claims for failure to state a claim upon which relief may be granted.

### I.    Count I – False Claims Act

Plaintiff alleges that defendant retaliated against him by firing him for trying to stop it from violating the Stark Law, which in turn implicated the False Claims Act.  Defendant argues that plaintiff has not sufficiently alleged protected activity and therefore the Court should dismiss his claim.  Specifically, defendant asserts that because plaintiff's job duties required him to report concerns about potential federal and state law violations, plaintiff did not place defendant on notice

that he was engaging in "protected activity."

The False Claims Act protects whistleblowers from retaliation by their employers. 31 U.S.C. § 3730(h).[10] To state a retaliation claim under the False Claims Act, plaintiff must allege that (1) he engaged in a protected activity; (2) defendant was on notice of that protected activity; and (3) defendant retaliated against plaintiff because of his protected activity. United States ex rel. Reed v. KeyPoint Gov't Sols., 923 F.3d 729, 764 (10th Cir. 2019).

To survive a motion to dismiss, plaintiff's complaint must allege facts which show that his employer knew of his efforts to stop a violation of the False Claims Act. Id. In the Tenth Circuit— because of a rebuttable presumption that in reporting incidences of fraud, a compliance employee is merely doing his job—a compliance employee "typically must do more than other employees to show that their employer knew of the protected activity."[11] Id. at 767. As a general rule, the

---

[10]    Section 3730(h)(1) states as follows:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). Plaintiff has not alleged that he acted in furtherance of an action under the False Claims Act. The Court therefore focuses on whether he has alleged that he acted to stop one or more violations of the False Claims Act.

[11]    By contrast, the United States Court of Appeals for the Ninth Circuit has recently held that the False Claims Act "does not hold an employee with compliance duties to a different standard than employees without such duties. Regardless of whether the employee has compliance duties, to satisfy the second element—the notice requirement—of [a False Claims Act] retaliation claim, the employer need only be aware of an employee's 'efforts to stop 1 or more violations of [the False Claims Act].'" Mooney v. Fife, 118 F.4th 1081, 1096 (9th Cir. 2024) (quoting 31 U.S.C. § 3730(h)(1)). The Ninth Circuit noted that to conclude otherwise would "strip protection from the employees who are in the best position to stop, or uncover and expose, the fraud against the

(continued. . .)

False Claims Act "does not protect activities that are within the scope of an employee's job responsibilities." Adler v. Continental Ins. Co., No. 95-2282-EEO, 1996 WL 677085, at *4 (D. Kan. Nov. 1, 1996). Accordingly, to adequately plead that defendant was on notice of his protected activity, a compliance employee must allege facts that, viewed in his favor, make clear that his employer had been put on notice that he was trying to stop it from violating the False Claims Act and not merely doing his job as a compliance employee. Reed, 923 F.3d at 764.

In Reed, plaintiff was a "Senior Quality Control Analyst," i.e. a compliance officer. She claimed that her former employer, KeyPoint Government Solutions, fired her in retaliation for efforts to stop it from fraudulently billing the government for work that had been inadequately or improperly completed. Id. at 736. KeyPoint was a private company that conducted background investigations for prospective federal employees. Id. at 738. As a Senior Quality Control Analyst, plaintiff would review the investigators' work, document incomplete investigations in a monthly report and perform regular audits of investigations. Id. at 740. In performing her job duties, plaintiff observed systemic violations of defendant's contract with the government and submission of fraudulent claims for payment based on incomplete or improperly completed investigations. Id. Plaintiff unilaterally voiced her concerns to her employer and regularly reported infractions to her supervisor; plaintiff also discussed the problems with other individuals at KeyPoint. Id. Following her reports, KeyPoint fired plaintiff. Id.

On appeal, the Tenth Circuit affirmed the district court's dismissal of plaintiff's retaliation claim, finding that she had failed to sufficiently plead that her employer was on notice of protected

---

[11] (. . .continued)
federal government that the [False Claims Act] seeks to prevent or eliminate." Id. The Tenth Circuit standard has also received criticism in academia. See John T. Nicolaou, Whistle While You Work: How The False Claims Act Amendments Protect Internal Whistleblowers, 2011 COLUM. BUS. L. REV. 531, 573–75 (2011).

activity, i.e. her reports of fraudulent claims for payment.  Id. at 764.  It examined whether in repeatedly reporting fraud, plaintiff had overcome the presumption that she was just "doing her job."  Id. at 768.  In doing so, the Tenth Circuit highlighted that (1) plaintiff linked her knowledge of and efforts to report the alleged fraud to her role as a Senior Quality Control Analyst; (2) plaintiff's staff assisted her in detecting and reporting the fraud; and (3) plaintiff reported misconduct on a regularized schedule as part of her job—which suggested a job-related mandate to do so.  Id. at 768.  It noted that reporting outside plaintiff's normal chain of command could overcome the presumption, but that she "never pleaded facts delineating her specific job description or defining the scope of her duties such that we could discern with some specificity the contours of Ms. Reed's chain of command or ordinary reporting structure related to fraud matters."  Id. at 770.

The Tenth Circuit acknowledged that it had never expressly held that a compliance officer may put her employer on notice by reporting fraud internally but outside her chain of command.  Id. at 769.  It nonetheless addressed "the cogency" of precedent to that effect in the Ninth and D.C. Circuits.  Id. (citing United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 897, 908 (9th Cir. 2017); U.S. ex rel. Schweizer v. Oce N.V., 677 F.3d 1228, 1239–40 (D.C. Cir. 2012)).  This Court assumes that the Tenth Circuit would so hold in a case where the complaint alleged that plaintiff's activity "broke the chain of command or ordinary communication protocol."  Id. at 770.

The Third Circuit has recently held that a compliance employee can sufficiently plead participation in protected activity by alleging that he went outside his chain of command to report concerns of fraud.  United States ex rel. Ascolese v. Shoemaker Constr. Co., 55 F.4th 188, 195–96 (3d Cir. 2022).  In Ascolese, plaintiff, a Quality Assurance/Quality Control Manager, i.e. a compliance employee, claimed that his former employer retaliated against him after he reported

-11-

deficiencies on a federally funded construction project. Id. at 192. Plaintiff worked for McDonough Bolyard Peck—a subcontractor tasked with quality control on a public housing construction project for the Philadelphia Housing Authority. Id. In his role, plaintiff identified dozens of deficiencies with the project, which he reported to his employer and Shoemaker Construction Company (the entity which hired McDonough Bolyard Peck as a subcontractor), believing that because of the deficiencies, it would be fraudulent to receive government funds for the project. Id. When he received no response to his internal complaints, plaintiff broke his chain of command and informed engineers at the Philadelphia Housing Authority of the deficiencies. Id. Based on these facts, the Third Circuit concluded that plaintiff pled that he engaged in protected activity and by going outside of his chain of command, defendant was on notice that he was not merely doing his job. Id. at 195.

Here, the question is whether the allegations of plaintiff's complaint overcome the presumption that in reporting potential violations of the Stark Law, plaintiff was just "doing his job" as CEO. Plaintiff argues that because defendant hired him to remedy its dire financial situation, he was not hired in a compliance capacity, that he was not acting as CEO when he reported potential violations and that defendant was on notice of his protected activity.

Viewing the facts in plaintiff's favor, he has sufficiently pled that his internal reports went beyond his duties as CEO. Plaintiff has alleged that (1) for the first eight months before he was reporting potential fraud, the Board thought he was doing his job and doing it well; (2) on October 5, 2022, plaintiff filed an employee grievance report to the Board which stated his concerns; (3) defendant violated its own policy by refusing to respond to plaintiff's grievance in a timely manner; (4) plaintiff's grievance report caused "noticeable hostility" at work; (5) on December 15, 2022, plaintiff submitted a second letter, asking the Board to ensure compliance

with applicable laws and providing specific recommendations to resolve the issues; (6) between October and December of 2022, plaintiff experienced "growing hostility" between him and the Board, the Board undercut decisions which it had previously approved and the Board president disinvited him the hospital's holiday party; (7) after the second letter, defendant placed plaintiff on administrative leave; (8) defendant's legal counsel admitted on January 4, 2023, that the doctors' compensation package was "quite aggressive;" (9) legal counsel criticized the timing of plaintiff's second letter even though plaintiff had repeatedly raised the issue for months; (10) after plaintiff again urged the Board to self-report potential Stark Law violations, it placed plaintiff on a performance improvement plan; (11) on May 16, 2023, plaintiff sent a third letter to the Board, reminding it of the potential Stark Law violations; and (12) the next day, defendant terminated plaintiff's employment.

Viewing these facts in the light most favorable to plaintiff, he has easily alleged that when he reported potential Stark Law violations, defendant did not see him as merely "doing his job." If defendant had perceived that plaintiff was merely "doing his job" in reporting alleged violations, it presumably would have supported his efforts to contain costs and not penalized and ostracized him for raising his concerns.  Moreover, when direct reports to the Board proved futile, plaintiff resorted to the employee grievance process.  The employee grievance process was presumably outside plaintiff's chain of command for addressing potential violations of the Stark Law, and presumably put defendant on notice that plaintiff was acting beyond his job duties as CEO.

In sum, plaintiff has plausibly alleged that defendant discharged, suspended, threatened, harassed "or in any other manner" discriminated against him because of efforts to rectify "quite aggressive" compensation agreements with Drs. Gaede, McKellar and Neill.  While some of plaintiff's conduct could be viewed as flowing from his job duties as CEO, other activities—

especially his pursuit of remedies under the employee grievance procedure—are reasonably viewed to be outside the chain of command and therefore put the Board on notice that in raising his concerns, plaintiff was not merely "doing his job."  In this regard, the Board's response to plaintiff's concerns is especially telling.  Plaintiff alleges that defendant hired him to cut costs and thought he was doing a great job until he took aim at the employment agreements of Drs. Gaede, McKellar and Neill.  While plaintiff did not allege the purpose of or attach the specific grievance policies and processes of defendant, such processes are typically established to resolve grievances by individual employees with respect to the terms and conditions of their employment—not systemic fraud.  In defense of a compensation arrangement that was admittedly "quite aggressive," the Board responded with social ostracism, a hostile work environment, mandatory training on disruptive behavior, leadership training, administrative leave and termination of employment. These allegations cannot be squared with any plausible notion that defendant thought that plaintiff was "doing his job" in reporting concerns, or that it lacked notice that plaintiff was engaging in protected activity under the False Claims Act.  For these reasons, the Court overrules defendant's motion to dismiss plaintiff's retaliation claim under the False Claims Act.

## II.    Count II – Kansas False Claims Act

Plaintiff alleges that defendant retaliated against him by firing him for trying to stop it from violating the Kansas False Claims Act.  Defendant argues that the Court should dismiss plaintiff's Count II claim because he has failed to allege (1) protected activity that put defendant on notice; (2) that he undertook lawful acts in furtherance of a Kansas False Claims Act action; and (3) that he made his reports to the Board in good faith.  Because the Court has already found that plaintiff plausibly alleged protected activity and that defendant had notice of such activity, the Court focuses on defendant's second argument.

Like the False Claims Act, the Kansas False Claims Act protects whistleblowers from retaliation by employers. K.S.A. § 75-7506. To prevail on his retaliation claim, however, the Kansas False Claims Act imposes additional requirements on the employee. See id. First, plaintiff's protected activity must be "in furtherance of an action" under the Kansas False Claims Act, including "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this act." Id. Second, plaintiff's conduct must have been taken "in good faith" on behalf of himself or other employees.[12] Id.

The Kansas legislature enacted the Kansas False Claims Act in 2009 and the language of the statute closely mirrors the language of the federal False Claims Act that was in effect in 2009. Klaassen, 84 F. Supp. 3d at 1262. Before Congress amended the False Claims Act in 2009 and 2010, protected activity under the federal False Claims Act included only conduct done "in furtherance of an action under this section," thus mirroring the current language of the Kansas False Claims Act. 31 U.S.C. § 3730(h) (2008); K.S.A. § 75-7506. Under that version of the statute, in this circuit, an employee alleged protected activity if he alleged facts showing that he pursued, prepared or assisted with an action under the False Claims Act. Reed, 923 F.3d at 765. Plaintiff could allege protected activity even if he never filed an action under the False Claims Act or if he filed an unsuccessful action. U.S. ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1522 (10th Cir. 1996). Merely reporting a False Claims Act violation to a supervisor,

---

[12]    No Kansas state court has cited or addressed the elements for a retaliation claim under the Kansas False Claims Act. Two District of Kansas cases have cited the statute, but neither directly relate to the issues here—one case considered who is an "employer" under the statute, and the other only summarily found that plaintiff's retaliation claim survived summary judgment. See Klaassen v. Univ. of Kansas Sch. of Med., 84 F. Supp. 3d 1228, 1261–62 (D. Kan. 2015); McCurdy v. Cowley Cnty. Developmental Servs., Inc., No. 11-1392-CM, 2014 WL 298680, at *1 (D. Kan. Jan. 28, 2014). Accordingly, defendant's arguments appear to be a matter of first impression for this Court.

-15-

however, did not constitute conduct "in furtherance of" an action under the statute.  <u>Reed</u>, 923 F.3d at 765.   Under the Kansas False Claims Act, plaintiff has alleged protected activity if he alleges "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this act."  K.S.A. § 75-7506.

Defendant argues that plaintiff has not alleged that he acted in furtherance of an action filed or to be filed under the Kansas False Claims Act.  Plaintiff responds by citing his allegation that "Mr. Kirk was concerned that NCH was in violation of applicable rules and regulations governing physician compensation rates."  <u>Plaintiff's Opposition To Defendant's Motion To Dismiss</u> (Doc. #17) filed December 9, 2024 at 9 (quoting <u>Complaint</u> (Doc. #1), ¶ 45).

This allegation is, at most, one veiled reference to the Kansas False Claims Act, and it is insufficient.  Merely reporting a potential violation of the statute, or having a subjective concern about a potential violation, is not protected activity in furtherance of a lawsuit under the Kansas False Claims Act.  Plaintiff has not alleged that he pursued, prepared, assisted with, initiated or provided testimony for an action under the Kansas False Claims Act.  Moreover, he has not alleged that he told the Board that he planned to file an action under the Kansas False Claims Act or that he had conducted an investigation for such an action.  Accordingly, plaintiff has failed to plausibly allege that he undertook protected activity in furtherance of an action under the Kansas False Claims Act.  The Court therefore sustains defendant's motion to dismiss plaintiff's retaliation claim under the Kansas False Claims Act and need not consider whether plaintiff took protected action in good faith.

## III.    Count III – Retaliatory Discharge

Plaintiff alleges that in violation of Kansas common law, defendant terminated his employment in retaliation for reporting potential violations of state and federal law.  Defendant

-16-

argues that the Court should dismiss plaintiff's claim because under the alternative remedies doctrine, his retaliation claim under the False Claims Act precludes his common law retaliation claim.

"Under the alternative remedies doctrine, a state or federal statute could be substituted for a state retaliation claim—if the substituted statute provides an adequate alternative remedy." Campbell v. Husky Hogs, L.L.C., 292 Kan. 225, 236, 255 P.3d 1, 8 (2011).  The alternative remedies doctrine only applies when the statutory claim and the common law claim seek to redress the same harm.  See id.  When plaintiff bases his common law retaliation claim on reporting violations of the False Claims Act, the False Claims Act provides an adequate statutory remedy. See United States ex rel. Coffman v. City of Leavenworth, Kansas, 303 F. Supp. 3d 1101, 1131 (D. Kan. 2018); U.S. ex rel. Feaster v. Dopps Chiropractic Clinic, LLC, No. 13-1453-EFM, 2015 WL 6801829, at *10 (D. Kan. Nov. 5, 2015); Lipka v. Advantage Health Grp., Inc., No. 13-CV-2223-JWL, 2013 WL 5304013, at *7 (D. Kan. Sept. 20, 2013).

Here, Count III alleges that defendant retaliated against him for engaging in the following protected activities: (1) reporting that defendant was potentially violating the Stark Law, 42 U.S.C. § 1395nn; (2) advising defendant to follow federal law and applicable rules and regulations governing Medicare patient referrals and compensation arrangements for physicians; and (3) objecting to defendant's violations of the Stark Law.  Complaint (Doc. #1), ¶ 149.  Plaintiff alleges no protected activity or harm which differs from those alleged in his retaliation claim under the False Claims Act.  Accordingly, the False Claims Act provides an adequate statutory remedy and precludes plaintiff's retaliation claim under Kansas common law.  The Court therefore sustains defendant's motion to dismiss plaintiff's retaliation claim under Kansas common law.

**IT IS THEREFORE ORDERED** that Defendant's Motion To Dismiss (Doc. #7) filed

November 6, 2024 is **SUSTAINED in part and OVERRULED in part.  The Court sustains defendant's motion to dismiss plaintiff's retaliation claims under the Kansas False Claims Act and Kansas common law (Counts II and III).  The Court overrules defendant's motion to dismiss plaintiff's retaliation claim under the False Claims Act (Count I).**

Dated this 4th day of February, 2025 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge